**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NATALIE ORBAN and DAVID ORBAN, <br><br> Plaintiffs, <br><br> v. <br><br> LIBERTY MUTUAL FIRE INSURANCE COMPANY, <br><br> Defendant. | Civ. No. 16-3050 <br><br> **OPINION** |

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court upon Defendant Liberty Mutual Fire Insurance Company's Motion for Summary Judgment. (ECF No. 21.) Plaintiffs Natalie Orban and David Orban oppose. (ECF No. 25.) The Court has decided this matter based on the written submissions of the parties without oral argument pursuant to Local Civil Rule 78.1(b). For the following reasons, Defendant's Motion is granted in part and denied in part.

## BACKGROUND

This case arises from Plaintiffs' insurance claim for damage to their home allegedly caused by the collapse of a sinkhole. Defendant had issued an insurance policy (the "Policy") to Plaintiffs that was in effect at all relevant times. (Def.'s Stmt. of Undisputed Material Facts ¶ 28, ECF No. 21-2.) The Policy excludes coverage for various types of loss, including "loss caused directly or indirectly by . . . [w]ater [d]amage, meaning . . . [w]ater below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure." (the "Water Damage Exclusion")

(Policy at LMP[1] 14–34, ECF No. 21-5.) The Water Damage Exclusion applies "regardless of any other cause or event contributing concurrently or in any sequence to the loss." (*Id.* at LMP 14.) The Policy also includes a Sinkhole Collapse Endorsement, providing insurance for "direct physical loss to property . . . caused by Sinkhole Collapse." (*Id.* at LMP 49.) It defines "Sinkhole Collapse" as "actual physical damage arising out of, or caused by, sudden settlement or collapse of the earth supporting such property and only when such settlement or collapse results from subterranean voids created by the action of water on limestone or similar rock formations." (*Id.*)

On April 16 and 17, 2015, Defendants were notified of cracks in the basement floor and foundation wall of Plaintiffs' house. (Finazzo Decl., Ex. 6, ECF No. 21-4.) Plaintiffs commissioned several parties to determine whether this damage was the result of a sinkhole collapse. First, Plaintiffs retained Frey Engineering, LLC ("Frey"), which concluded that the damage was caused by a sinkhole. (Orban Decl. ¶ 14, ECF No. 25-2; Lander Dep. 40:11–17, ECF No. 25-3.) Second, Plaintiffs retained Ground Penetrating Radar Systems, Inc. ("GPRS"), which "sen[t] a series of radar pulses into the surface which reflect[ed] back off of anomalies below." (Orban Decl. ¶ 15; GPRS Report at 2, ECF No. 25-2.) GPRS "located multiple anomalies consistent with that of a void present underneath the surface." (GPRS Report at 3.) However, GPRS only searched the property around the house, not any matter underneath the house itself. (*Id.* at 8.) Third, Plaintiffs retained Enviroprobe Service, Inc. ("Enviroprobe") to conduct a "subsurface geophysical investigation" using electrical resistivity data. (Orban Decl. ¶ 18; Enviroprobe Report at 2, ECF No. 25-2.) Enviroprobe also found six "high-resistivity zones suspected as voids." (Enviroprobe Report at 3.) Like GRPS, Enviroprobe did not search the area underneath the house itself but only the property surrounding the house. (*Id.* at 2–3.)

---

[1] "LMP" refers to the Bates numbering system that identifies pages of the Policy.

Plaintiffs also asked two individual experts to determine whether damage to the home resulted from a sinkhole collapse. James Hill, who did not hold himself out as a structural engineer (Hill Dep. 30:4–5, ECF No. 21-6), testified that at least one of the cracks is an expression of a "sinkhole throat" (*id.* 128:16–22). Hill stated that these cracks did not signify a sinkhole collapse (*id.* 128:1–7), which he defined as "the expression of a sinkhole to the point where all the surface material has gone down into it and the rest of it is ready to go" (*id.* 124:21–125:1).

Glenn Brackmann, who is a structural engineer (*id.* 30:6–8), acknowledged that the foundation walls were not reinforced with rebar, which they should have been. (Brackmann Dep. 37:25–38:2, ECF No. 21-5.) Brackmann also stated that he searched, though not thoroughly, for evidence of a functional foundation drain system and did not find one. (*Id.* 48:14–50:9.) According to Brackmann, the lack of a functional foundation drain system, even with properly constructed foundation walls, would increase the pressure exerted by earth and water on the foundation walls, though it would not significantly stress the basement floor. (*Id.* 51:1–25.) Brackmann acknowledged that the damage to Plaintiffs' house could be due to other causes (*id.* 165:5–24), but ultimately concluded that, given all the information available to him, the damage to the southeast corner of the foundation was probably caused by a sinkhole. (Brackmann Dep. 128:14–129:25, 162:8–163:9, ECF No. 25-3.)

Defendant eventually charged general adjuster Fritz Lander with leading the investigation of Plaintiffs' claim. (Lander Dep. 30:18–31:2.) Lander led a five-person team that decided to deny the claim. (*Id.* 22:9–13). The team arrived at this decision largely or entirely on the basis of reports by two engineers—Chris Reith and Peter Svaboda—commissioned by Defendant. (*Id.* 18:10–18, 24:3–7, 27:8–15.) Lander's team had the opportunity to examine other materials,

including the report from Frey. (*Id.* 33:15–34:9.) Lander was not aware of anyone on the team questioning or speaking to Reith or Svaboda (*id.* 34:10–21), and the team did not search for another expert or more evidence to reconcile the conflicting opinions of Frey on the one hand and Reith and Svaboda on the other (*id.* 40:18–41:20, 42:8–14, 62:19–63:17). Lander ultimately concluded that the Frey report was wrong because it conflicted with Reith's and Svaboda's conclusions. (*Id.* 41:21–42:7.) In his deposition, Lander expressed "very little" understanding of how sinkholes are created and was unable to formulate a definition of the term "sinkhole." (*Id.* 25:2–11.)

Plaintiffs filed the current suit on April 27, 2016 in the Superior Court of New Jersey, Law Division, alleging three Counts: (1) breach of contract for failure to pay Plaintiffs' insurance claim (Compl. ¶¶ 1–27, ECF No. 1-1); (2) bad faith in denying the insurance claim (*id.* ¶¶ 28–29); and (3) bad faith in threatening reimbursement on a claim Defendant had previously paid to Plaintiffs, as a means of retaliation against Plaintiffs (*id.* ¶¶ 30–31). Defendant removed to this Court on May 27, 2016. (Notice Rmv'l, ECF No. 1.)

On July 26, 2018, Defendant moved for summary judgment on all claims. (ECF No. 21.)[2] Pursuant to the deadlines set forth in a previous Order (ECF No. 20), Plaintiffs opposed the Motion on September 13, 2018 (ECF No. 25), and Defendants replied on September 28, 2018 (ECF No. 26). This Motion is presently before the Court.

**LEGAL STANDARD**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute

---

[2] Defendant moved in the alternative to dismiss the bad faith claims under a Rule 12(b)(6) standard. Because discovery has closed and matters outside the pleadings have been presented to the Court, the Court construes the entire Motion under the Rule 56 summary judgment standard. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.")

4

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Id.* When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). Consequently, "[s]ummary judgment is precluded if a disputed fact exists which might affect the outcome of the suit under the controlling substantive law." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993) (citing *Anderson*, 477 U.S. at 248).

In resolving a motion for summary judgment, a district court considers the facts drawn from "the pleadings, the discovery and disclosure materials, and any affidavits." *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002) (internal quotations omitted). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the nonmoving party. *Id.* at 248–49. The Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## DISCUSSION

I.  **A Reasonable Jury Could Find for Plaintiffs on the First Count (Breach of Contract)**

In a nutshell, Plaintiffs claim that the loss they suffered was covered under the Policy they entered into with Defendant, and so Defendant's refusal to pay their claim constitutes breach of contract. (Compl. ¶¶ 1–27.) In interpreting the terms of an insurance agreement, New Jersey courts apply any clear and unambiguous terms as they are written. *Flomerfelt v. Cardiello*, 997 A.2d 991, 996 (N.J. 2010). However, "[i]f the terms are not clear, but instead are ambiguous, they are construed against the insurer and in favor of the insured, in order to give effect to the insured's reasonable expectations." *Id.* (internal citations omitted). Exclusionary clauses in insurance policies are to be narrowly construed—though their plain meaning may not be ignored—and the insurer has the burden of showing that a given loss is within the exclusion. *Id.* at 996–97.

In this case, the Sinkhole Collapse Endorsement included in the Policy covers "actual physical damage arising out of, or caused by, sudden settlement or collapse of the earth supporting such property and only when such settlement or collapse results from subterranean voids created by the action of water on limestone or similar rock formations." (Policy at LMP 49.) Plaintiffs have put forth sufficient facts that a reasonable jury could find that the damage done to Plaintiffs' house is covered by the Policy. Brackmann, a structural engineer, testified that sinkhole collapse was probably the cause of the cracks in the southeast corner of the foundation. (Brackmann Dep. 128:14–129:25, 162:8–163:9.) Hill, though not a structural engineer, also claimed that the loss was caused by a sinkhole. (Hill Dep. 128:16–22.)[3]

---

[3] Hill stated in his deposition that there were no signs of a "sinkhole collapse." (Hill Dep. 128:1–7.) But Hill narrowly defined "sinkhole collapse" to mean "the expression of a sinkhole to the point where all the surface material has gone down into it and the rest of it is ready to go."

Defendant argues, in a separate Motion, that Hill and Brackmann's testimony fails to meet evidentiary standards as expert testimony. (ECF No. 22.) But even if this testimony is excluded at trial, Plaintiffs have presented additional evidence in the form of three engineering reports—those conducted by Frey, GPRS, and Enviroprobe. Even though the latter two of these reports investigated only sinkholes located outside the perimeter of the house (GPRS Report at 8; Enviroprobe Report at 2–3), the reports present sufficient circumstantial evidence to enable a reasonable jury to conclude that similar sinkholes might exist beneath the house.

Defendant also argues that, even if the damage to Plaintiffs' house was caused by sinkhole collapse, Plaintiffs cannot recover because of the Policy's Water Damage Exclusion. (Def.'s Br. at 25–29, ECF No. 21-1.) The Water Damage Exclusion, by its terms, excludes coverage for "loss caused directly or indirectly by [water damage,] regardless of any other cause or event contributing concurrently or in any sequence to the loss." (Policy at LMP 14–15.) Thus, according to Defendant, "if Plaintiffs' loss was caused even in part by Water Damage, . . . there is no coverage for Plaintiffs' claims." (Def.'s Br. at 27.) But even if Defendant's interpretation of the Policy is correct on legal grounds, there is a genuine dispute of fact as to whether Plaintiffs can claim any loss that was not caused in part by water damage. (*See, e.g.*, Brackmann Dep. 51:1–25, 128:14–129:25.) The Court cannot determine whether or how water damage caused Plaintiffs' loss without weighing the credibility of various pieces of evidence that have been presented to it. Summary judgment must therefore be denied as to the First Count.

---

(124:21–125:1.) Hill attributed damage to Plaintiffs' house to a "sinkhole throat," *i.e.*, the narrow bottom of a funnel-shaped sinkhole. (*Id.* 128:16–22.) Such damage is "caused by[] sudden settlement or collapse of the earth . . . when such settlement or collapse results from subterranean voids created by the action of water on limestone or similar rock formations" (Policy at LMP 49) and so would clearly fall within the bounds of the Policy.

**II.     Summary Judgment is Warranted on the Second Count (Bad Faith in Denying the Claim)**

Plaintiffs allege that Defendant acted in bad faith by denying their insurance claims. (Compl. ¶¶ 28–29.) The cause of action for bad faith arises out of the duty of good faith and fair dealing that is implied in all contracts. *Pickett v. Lloyd's*, 621 A.2d 445, 450–51 (N.J. 1993). Success on a claim of bad faith requires a showing that the insurer knowingly or recklessly lacked a reasonable basis to deny the claim. *Id.* at 453–54. A bad faith claim must fail where the insurer's denial of the claim was fairly debatable. *Id; see also Badiali v. N.J. Mfrs. Ins. Grp.*, 107 A.3d 1281, 1288 (N.J. 2015) ("[A] plaintiff must show 'that no debatable reasons existed for denial of the benefits.'" (quoting *Pickett*, 621 A.2d at 457)). "[A] claimant who could not have established as a matter of law a right to summary judgment on [the breach of contract claim] would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim." *Pickett*, 621 A.2d at 454 (internal citation omitted).

Here, Defendant refused to pay Plaintiffs' claim on the basis of reports written by two engineers, Reith and Svaboda. No facts have been put forth to show that these reports were wholly fraudulent, or were crafted without any investigation or expertise. *See Bello v. Merrimack Mut. Fire Ins. Co.*, 2012 WL 2848642, at *7 (N.J. Super. Ct. App. Div. July 12, 2012) (finding that the "fairly debatable" question was one for the jury where the insurer relied on a report by a non-engineer that acknowledged the merit of the insured's claim). Examining the record in the light most favorable to Plaintiffs, Defendant rubber-stamped the conclusions of Reith and Svaboda and ignored contrary evidence. But the fact that these two engineers arrived at conclusions consistent with Defendant's decision to deny Plaintiffs' claim demonstrates that that decision was fairly debatable. Summary judgment must therefore be granted in favor of

Defendant on the Second Count.[4]

## III. A Reasonable Jury Could Find for Plaintiffs on the Third Count (Bad Faith in Threatening to Seek Reimbursement)

Plaintiffs also allege that Defendant acted in bad faith when it threatened to seek reimbursement from Plaintiffs on a claim that it had already paid. (Compl. ¶¶ 30–31.) As discussed in the previous section, an insurer acts in bad faith when it acts without a reasonable basis, and when the insurer knows or is reckless in not knowing that its action lacks a reasonable basis. *Pickett*, 621 A.2d 453–54. Plaintiffs allege that Defendant's decision to retroactively seek reimbursement was made in retaliation for Plaintiffs' filing a new claim. But Defendant claims that Plaintiff David Orban fraudulently misrepresented information, which caused Defendant to pay the claim in error. At this time, the Court lacks sufficient information to rule on this Count as a matter of law. Summary judgment on the Third Count is therefore denied.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is granted in part and denied in part. An accompanying Order will follow.

Date:   10/9/2018                           */s/ Anne E. Thompson*
                                            ANNE E. THOMPSON, U.S.D.J.

---

[4] Plaintiffs request leave to amend the Complaint. (Pls.' Br. at 16, ECF No. 25) Although leave to amend generally should be freely given, it may be denied if amendment would be futile. *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000) (citing *Smith v. NCAA*, 139 F.3d 180, 190 (3d Cir. 1998)). Here, evidence obtained through discovery demonstrates that Defendant's denial of the claim was fairly debatable, so granting leave to amend the Complaint would be futile. The Court therefore denies Plaintiffs' request for leave to amend.